UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REDENTOR GALANG,

    Petitioner,

    v.

A. P. KANE, warden,

    Respondent.

No. C 06-3546 MHP (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Redentor Galang, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Galang was convicted in Los Angeles County Superior Court of conspiracy to commit second degree murder with a firearm enhancement. His conviction was pursuant to a plea agreement. On September 24, 1985, he was sentenced to a total of 16 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a July 28, 2004 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The hearing was his ninth parole hearing, and was conducted at a time when he was 20 years into his 16-to-life sentence.

The BPH identified the circumstances of the commitment offense, Galang's prison misbehavior, his unfavorable psychological report, and his need for further participation in self-help programming as the reasons for its decision that his release would pose an

unreasonable risk of danger to society or threat to public safety.  The BPH also relied on the opposition to parole by the district attorney's office.

Galang sought relief in the California courts.  The Monterey County Superior Court denied his petition for writ of habeas corpus in a reasoned decision.  The California Supreme Court summarily denied his petition for writ of habeas corpus.

Galang then filed his federal petition for a writ of habeas corpus.  The court found cognizable his claims that (1) his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole and (2) the BPH was a biased decision-maker in violation of his right to due process.  Respondent filed an answer and Galang filed a traverse.  A third, unexhausted, claim that he raised in his traverse was later dismissed voluntarily.

The court had intended to wait for guidance from the anticipated en banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008).  Although much time has passed, Hayward remains pending in the appellate court and it is unknown to this court when the decision will be released.  The court will proceed to decide the merits of the petition without the benefit of the Hayward decision.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims remaining for adjudication.

2

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and

1 assures that 'the record is not so devoid of evidence that the findings of the . . . board were
2 without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472
3 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law
4 in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.  As a matter of state
5 law, the parole authority's decision must also satisfy the "some evidence" standard of review.
6 See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review
7 properly is characterized as whether 'some evidence' supports the conclusion that the inmate
8 is unsuitable for parole because he or she currently is dangerous").

9       Having determined that there is a due process right, and that some evidence is the
10 evidentiary standard for judicial review, the next step is to look to state law because that sets
11 the criteria to which the some evidence standard applies.  One must look to state law to
12 answer the question, "'some evidence' of what?"

13 B.     <u>State Law Standards For Parole For Life Prisoners In California</u>

14       California uses indeterminate sentences for those convicted of most non-capital
15 murders and conspiracy to commit such murders, with the term being life imprisonment and
16 parole eligibility after a certain minimum number of years.  A first degree murder conviction
17 yields a minimum term of 25 years to life and a second degree murder conviction yields a
18 minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061,
19 1078 (Cal. 2005); Cal. Penal Code § 190.  Assuming the crime exists, see RT 53-54,
20 conspiracy to commit second degree murder therefore results in the same sentence as second
21 degree murder.  See Cal. Penal Code § 182 ("When they conspire to commit any other
22 felony, they shall be punishable in the same manner and to the same extent as is provided for
23 the punishment of that felony.")  California's parole scheme described below provides that a
24 release date normally must be set for a indeterminate life prisoner unless various factors
25 exist, but the "unless" qualifier is substantial.

26       A BPH panel meets with an inmate one year before the prisoner's minimum eligible
27 release date "and shall normally set a parole release date. . . .  The release date shall be set in a
28 manner that will provide uniform terms for offenses of similar gravity and magnitude in

4

1 respect to their threat to the public, and that will comply with the sentencing rules that the
2 Judicial Council may issue and any sentencing information relevant to the setting of parole
3 release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
4 panel "shall set a release date unless it determines that the gravity of the current convicted
5 offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
6 is such that consideration of the public safety requires a more lengthy period of incarceration
7 for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.
8 Penal Code § 3041(b).

9       The parties base their arguments on the regulations for parole consideration of
10 prisoners convicted of murder, 15 Cal. Code Regs. § 2400 et seq.  Galang was not, however,
11 convicted of murder and those regulations may not be the appropriate regulations.  Instead,
12 his case appears to be covered by the regulations at 15 Cal. Code Regs. § 2280 et seq. which
13 apply to non-murdering life prisoners.  The difference between the two sets of regulations is
14 insubstantial.  See 15 Cal. Code Regs. § 2400 (last paragraph).

15       One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for
16 consideration of a wide range of information in determining suitability, see § 2281(b), and
17 lists circumstances tending to show suitability and circumstances tending to show
18 unsuitability, § 2281(c) and (d).[1]  The regulation also provides that "[t]he panel shall first
19 determine whether a prisoner is suitable for release on parole.  Regardless of the length of
20 time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment
21 of the panel the prisoner will pose an unreasonable risk of danger to society if released from
22 prison." 15 Cal. Code Regs. § 2281(a).  The regulations contain a matrix of suggested base
23 terms for several categories of crimes.  See 15 Cal. Code Regs. § 2282.  The statutory
24 scheme places individual suitability for parole above a prisoner's expectancy in early setting
25 of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.
26 Under state law, the matrix is not reached unless and until the prisoner is found suitable for
27 parole. Id. at 1070-71.

28

5

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

A critical issue in parole denial cases concerns the parole authority's use of evidence about the criminal offense that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[3] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the

6

commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

      The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[4]

C.     <u>Some Evidence Supports The BPH's Decision In Galang's Case</u>

    1.     <u>BPH Decision</u>

      The BPH identified the circumstances of the commitment offense, Galang's prison misbehavior, his unfavorable psychological report, and his need for further participation in

1  self-help programming as the reasons for its decision that his release would pose an
2  unreasonable risk of danger to society or threat to public safety. The BPH also relied on the
3  opposition to parole by the district attorney's office. In its decision, the BPH noted that there
4  were some good points for Galang, e.g., that he had no other criminal record, that he had
5  developed some marketable skills, and that he participated in a self-help program and was in
6  the prison fellowship ministry. Nonetheless, the positive aspects of his behavior did not
7  outweigh the factors of unsuitability, in the BPH's view.

    a. <u>Commitment Offense</u>

In finding Galang unsuitable, the BPH stated that the commitment offense "was carried out in a dispassionate and calculated manner, multiple victims were attacked and injured in the same incident. The offense was carried out in a manner which demonstrates a callous disregard for human suffering." Resp. Exh. 2, 7/28/04 BPH hearing reporter's transcript ("RT") at 60. The motive for the crime was trivial and inexplicable. The circumstances of the commitment offense could be considered as tending to indicate unsuitability. <u>See</u> 15 Cal. Code Regs. § 2281(c)(1).

Galang was involved in an evening of gang retaliation, during the course of which two people were killed and two other people were wounded in separate shooting incidents. He did not shoot any of the victims, but instead drove one of the two cars that carried the shooters to the victims. The BPH relied on the probation officer's report that described the criminal episode.

> In the latter part of December of 1982, there were four separate inter-gang related shooting incidents in the Eagle Rock area of Los Angeles. Three persons were killed; two more were seriously injured. The primary motive for the initial shooting was a territorial dispute between two rival gang factions, the Satanas, a Filipino gang, and a rival Mexican gang, "the Avenues."
>
> The series of crimes that the defendant participated in were triggered by the leader of the "Satana" gang member, Edgar Pablo, [being] killed by the "avenues" on December 22, 1982 at about 1:30 a.m. Pablo was buried on December 27, 1982. All of the defendants charged in this case were present at the funeral and attended a group wake. They later discussed retaliation with the "Avenues" for the killing of Pablo. Defendants split up in two groups of four to search out the neighborhood in two cars to avenge the shooting of Pablo, by shooting some of them. Defendant (the driver) went in one car with co-defendants Bayani, Elegre, and Gutierrez. The second group went in Agnir's car with the other co-defendants Guting, the driver, together with Mortel and Sen Luis. All were armed with rifles and handguns. Upon reaching an

8

> alley between Langdal and Ridgeway Avenue, the two cars separated, each taking up a position at the opposite end of the alley. At the same time, two victims, Francisco Gomez, age 22 at the time, and Luis Silva, age 23, were leaving the Gomez residence and were entering Silva's station wagon parked in the alley. Following a brief distance of pursuit, co-defendants Mortel and Agnir, both armed, approached a car on foot, each on one side of the vehicle. Four victims, who were trapped in the car, were fired upon at close range. Gomez died in the passenger seat as a result of a gunshot wound in the head and Silva was able to get out of the car and was gunned down as he ran and died from four gunshot wounds inflicted by co-defendant Agnir. Both Mortel and Agnir then returned to their car, and then returned to defendant Galang's residence. It is reported that neither of the victims was associated with any gang. Defendant's group, in the other car, was unaware of the double killing and continued looking for the "avenues." They spotted two males at the telephone booth near Avenue 54 and York Boulevard. Both victims were shot upon but they survived. Neither had any gang affiliation.

Resp. Exh. 3 at 2-4. About a month later, one of the shooters was arrested and a weapon he was carrying was determined to have been used in the criminal episode in which Galang was involved. The arrestee spoke to police and implicated his fellow gang members, including Galang. Galang was arrested in Oxnard on February 10, 1983. Id. at 4-5

        b.     <u>Prison Misbehavior</u>

The BPH rested its decision in part on Galang's prison misbehavior. RT 61. Galang had received seven CDC-115 rule violation reports for serious misconduct and four CDC-128 counseling memoranda for lesser transgressions. The BPH was most concerned about the CDC-115 in 2000 for battery on an inmate and in 1998 for possession of a weapon. RT 61. With regard to the 2000 battery, "[i]nformation in the confidential file indicates that he was identified by two Asian inmates as one of the assailants that attacked him, striking him with their fists, because the Asian victims would not join their Asian group." RT 61; see Resp. Exh. 5 at 3 (psychological report). Galang denied involvement in the 2000 attack and denied being in possession of the weapon found in his cell in 1998. RT 43.

Although the BPH focused on just the two most recent serious rule violations, Galang had others that indicated continued problems. See Resp. Exhs. 20-26. In December 1986, he received a CDC-115 for engaging in a fistfight with his cellmate. In April 1987, he and several other inmates received CDC-115s for participating in a work strike and refusing to return to work after the lunch break. In April 1988, Galang received a CDC-115 for possession of inmate-manufactured alcohol. In August 1990, Galang received a CDC-115

9

for refusing to perform assigned duties.  In December 1990, Galang received a CDC-115 for possession of a red privilege card obtained through fraud and forgery.  He was found guilty on each of these CDC-115s.

    c.  <u>Psychological Evaluation</u>

  The BPH also relied in part on the psychological evaluation from 2004 that was "not totally supportive of release." RT 61.  The psychological report noted the two recent CDC-115 disciplinary offenses and stated: "Ordinarily, based on his accomplishments in the institutional environment, strong community support, and general positive adjustment, inmate Galang would be rated as having a risk level of below average in comparison to other inmates.  However, in view of the two disciplinaries noted above, the risk level is increased to average in comparison to other inmates. [¶] Negative peer associates would be a risk factor in this case, as this factor was related to his commitment offense, as well as his disciplinary received on 10/02/00." Resp. Exh. 5 at 3.

    d.  <u>Need For Further Self-Help Programming</u>

  The BPH stated in its decision that Galang needed "to participate in self-help in order to face, discuss, understand and cope with stress in a nondestructive manner.  Until progress is made the prisoner continues to be unpredictable and a threat to others." RT 62.  Although there was no evidence of an alcohol or substance abuse problem, one commissioner recommended that Galang "[g]et involved with the NA or AA 12 steps.  Although they're saying that you don't have substance abuse, but it's not just for substance abuse.  It also helps you build character and good judgment by following the steps." RT 63.  The other commissioner indicated that he thought that Galang was "in denial in some areas"  based on Galang's denial of responsibility for the weapon possession that led to the 1998 CDC-115, denial of involvement in the assault that led to the 2000 CDC-115, and minimization of his involvement in the gang shootings when he spoke to the psychologist. RT 64.  This commissioner also recommended that Galang consider AA and NA as resources for problem-solving skills.

2. <u>State Court Decision</u>

The Monterey County Superior Court rejected Galang's habeas petition in a reasoned decision. Resp. Exh. 10. The court noted that the Board found Galang unsuitable because of the circumstances of the commitment offense, his prison misconduct that included an assault on two Asian-American inmates for refusing to join an Asian group, and a psychological report that noted his risk level was average. The court determined that, based on these findings, it was "satisfied that there is 'some evidence' on the record in support of the Board's findings." <u>Id.</u> at 2.

The court criticized the BPH's recommendation that Galang become involved with AA or NA in light of the recognition that he does not have a drug or alcohol problem. <u>Id.</u> The commissioner's suggestion "was well meaning, but it was also inappropriate. Participation in substance abuse programs such as Alcoholics Anonymous and Narcotics Anonymous is not an appropriate consideration in parole hearings unless the inmate has a demonstrable substance abuse problem." <u>Id.</u> Not only was it not appropriate on the facts of this case, "suggesting that Petitioner join a fellowship of alcoholics or drug addicts to 'build character and good judgment' does not strike the Court as sound advice, and encouraging non-addicts to join substance abuse programs does a disservice to individuals within the programs who are making an honest recovery effort." <u>Id.</u> at 2-3.

3. <u>Analysis Of Federal Claim</u>

This court applies § 2254(d) to the Monterey County Superior Court's decision because it is the last reasoned decision from a state court on Galang's claim. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to <u>In re Rosenkrantz</u>, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the <u>Superintendent v. Hill</u> some evidence standard as the proper standard for judicial review of evidentiary sufficiency for administrative cases. <u>See</u> <u>Rosenkrantz</u>, 29 Cal. 4th at 665-67. The superior court cited another state appellate decision for its amplification on the some evidence standard, as it

11

stated that "*[i]t is not sufficient that the evidence overwhelmingly contradicts the parole board's decision*. So long as there is 'some evidence' in support of the board's findings, a court must uphold the decision." Resp. Exh. 10 at 1 (italics added). There is disagreement in the courts as to whether the italicized statement correctly describes the some evidence standard, but this court need not decide whether it does because this case does not have those facts. The court does not today face a case where the evidence overwhelmingly contradicts the decision of the BPH. Galang's prison misbehavior and unsupportive psychological evaluation in addition to his commitment offense make this a case where the BPH did not rely on just the commitment offense and did not have evidence that overwhelmingly contradicted its decision that Galang was unsuitable.

The superior court did not unreasonably apply Superintendent v. Hill in determining that there was some evidence to support the BPH's decision. Notwithstanding some positive factors for Galang, the BPH had determined that, 20 years into his 16-to-life sentence, Galang posed an unreasonable risk of danger to society if released from prison because of the commitment offense plus his prison misconduct and his unfavorable psychological report. (Since the state court rejected the recommendation that Galang needed further self-help programming in AA or NA, this court will follow suit and evaluate the other reasons relied upon by the BPH to see if the decision has sufficient support.) There is a rational connection between the evidence relied on and the decision that he is a current threat. Although he was not the shooter, Galang was an integral part of a deadly episode of gang retaliation: he drove one of the two cars of armed gang members who went out looking for rival gang members to attack to avenge the death of one of their own gang members. As sometimes happens, innocent people unconnected to the gang feud were victimized. Even though Galang claimed that he didn't expect retaliation to occur that night, his statements at the hearing show that he knew retaliation against the rival gang was an inevitability (perhaps because he had been in the gang for several years) and knew that the two men who got out of his car were going to shoot at two of the victims. See RT 13-14, 37, 39-40, 46  Although the conspiracy to commit murder was obviously a very large factor in its decision, the BPH did not rely solely on the

1  conspiracy to commit murder and instead properly relied on that crime plus a combination of
2  several other factors, including multiple episodes of prison misconduct and an unfavorable
3  psychological report. See 15 Cal. Code Regs. § 2281(b) ("Circumstances which taken alone
4  may not firmly establish unsuitability for parole may contribute to a pattern which results in a
5  finding of unsuitability.")

6  The prison misconduct in 2000 is especially troubling as it was relatively recent (i.e.,
7  less than 4 years before the hearing) and had some markers of gang-like activities. The
8  CDC-115 stated that, after an investigation, "it has been concluded that an element of
9  Asian/Pacific Islander inmates have been pressuring and committed battery on other
10 Asian/Pacific Islander inmates on the "B" Yard, in order to control the Asian/Pacific Islander
11 inmate population. Based on multiple, confidential sources, Inmate GALANG, D-15354,
12 WA-204U, has been identified in the battery" on three inmates. Resp. Exh. 26 at 1.
13 According to confidential information, Galang was identified "as a leader" and one of the
14 inmates who battered the three inmates. Id. The group may not be a gang, but the organized
15 efforts to intimidate and control other people are like those of gangs. This kind of activity is
16 particularly of concern in light of the fact that Galang is in prison because of his activities in
17 a street gang 20 years earlier.  In short, even though it was 20 years since he participated in
18 the conspiracy to commit murder that left two individuals dead and two more wounded, he
19 had engaged in further recent misconduct that looked like an orchestrated attack to exert
20 power over other inmates.

21 Bearing in mind that the court's chore is to consider not whether some evidence
22 supports the reasons, but whether some evidence supports the conclusion that Galang's
23 release unreasonably endangers public safety, this court concludes that the Monterey County
24 Superior Court's rejection of his insufficient evidence claim was not contrary to or an
25 unreasonable application of the Superintendent v. Hill some evidence standard.

26 D. Biased Decision-Maker Claim
27 Galang asserts in his petition that the BPH had "adopted an anti and/or no parole
28 policy per se, or a policy of underinclusion demonstrating a policy of systematic bias."

13

Petition, p. 5. Galang offers no evidentiary support for his conclusory allegations. "It is well-settled that '[c]onclusory allegations which are not supported by a clear statement of specific facts do not warrant habeas relief." Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Galang further argues that the low number of paroles granted violated the legislative intent of California Penal Code § 3041 that a parole date shall normally be set. This argument has no merit for the reasons discussed in Section B above, which explains that the inmate must be found suitable before the release date needs to be set. The state statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th at 1070-71. Galang is not entitled to the writ on this claim.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 26, 2010

Marilyn Hall Patel
United States District Judge

# **NOTES**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison.  15 Cal. Code Regs. § 2281(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2281(d).  The circumstances listed as tending to show unsuitability and suitability "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."  15 Cal. Code Regs. § 2281(c) and (d).

2.      The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  <u>See</u> <u>Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority.  Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

3.      <u>En banc</u> review is now pending in a fourth case regarding the some evidence standard, <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir. 2008).  The order granting <u>en banc</u> review states that the panel opinion is of no precedential value.

4.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to public safety."  <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole in <u>Shaputis</u>.